NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

MAR 29 2017

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NATIONAL ABORTION FEDERATION, NAF, <br><br> Plaintiff-Appellee, <br><br> v. <br><br> CENTER FOR MEDICAL PROGRESS; BIOMAX PROCUREMENT SERVICES, LLC; DAVID DALEIDEN, AKA Robert Daoud Sarkis; TROY NEWMAN, <br><br> Defendants-Appellants. | No.   16-15360 <br><br> D.C. No. 3:15-cv-03522-WHO <br><br> MEMORANDUM* |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick III, District Judge, Presiding

Argued and Submitted October 18, 2016
San Francisco, California

Before:  CALLAHAN and HURWITZ, Circuit Judges, and MOLLOY,** District Judge.

1.  Plaintiff-Appellee the National Abortion Federation ("NAF") is a non-

---

\*       This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\*       The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

profit professional association of abortion providers whose mission is "ensur[ing] safe, legal, and accessible abortion care." NAF conducts annual meetings of its members and invited guests which are not open to the public. All meeting attendees must sign confidentiality agreements before obtaining meeting materials and access to the meeting areas.

2. The individual Defendants-Appellants are anti-abortion activists. Defendant-Appellant David Daleiden founded the Center for Medical Progress ("CMP") and later created the "Human Capital Project" to "investigate, document, and report on the procurement, transfer, and sale of fetal tissue."

3. In order to obtain an invitation to attend NAF's 2014 and 2015 annual meetings, the individual defendants misrepresented themselves as representatives of a company, BioMax Procurement Services LLC ("BioMax"), purportedly engaging in fetal tissue research. Daleiden—purporting to be a BioMax representative and using an alias—signed "Exhibit Agreements" for both annual meetings in which he acknowledged, among other things, that all written, oral, or visual information disclosed at the meetings "is confidential and should not be disclosed to any other individual or third parties" absent written permission from NAF.[1]

4. The individual defendants and several investigators they hired to pose as

---

[1] In signing the agreement, Daleiden also falsely affirmed that all information contained in BioMax's application and other correspondence with NAF was "truthful, accurate, complete, and not misleading."

2

BioMax representatives also signed "Confidentiality Agreements" that prohibited: (1) "video, audio, photographic, or other recordings of the meetings or discussions at this conference;" (2) use of any "information distributed or otherwise made available at this conference by NAF or any conference participants . . . in any manner inconsistent with" the purpose of enhancing "the quality and safety of services provided by" meeting participants; and (3) disclosure of any such information "to third parties without first obtaining NAF's express written consent."

5. Notwithstanding these contracts, the defendants secretly recorded several hundred hours of the annual conferences, including informal conversations with other attendees. The defendants attempted in those conversations to solicit statements from conference attendees that they were willing to violate federal laws regarding abortion practices and the sale of fetal tissue.

6. The defendants then made some of the recordings public. After the release of the recordings, incidents of harassment and violence against abortion providers increased, including an armed attack at the clinic of one of the video subjects that resulted in three deaths.

7. The district court issued a preliminary injunction enjoining the defendants from, in contravention of their agreements with NAF, "publishing or otherwise disclosing to any third party": (1) any "recordings taken, or any confidential information learned, at any NAF annual meetings;" (2) "the dates or locations of any

future NAF meetings;" and (3) "the names or addresses of any NAF members learned at any NAF annual meetings."

8. We have jurisdiction over the defendants' appeal of that preliminary injunction under 28 U.S.C. § 1292(a)(1). We review for abuse of discretion, *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (en banc), and affirm. The district court carefully identified the correct legal standard and its factual determinations were supported by the evidence. *Id.*; *see also Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (asking whether the "district court's application of the correct legal standards was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record").

9. We add only a few thoughts to the district court's careful discussion. First, the defendants do not contest that they engaged in misrepresentation and breached their contracts. But, they claim that because the information they obtained is of public interest, the preliminary injunction is an unconstitutional prior restraint. Even assuming arguendo that the matters recorded are of public interest, however, the district court did not clearly err in finding that the defendants waived any First Amendment rights to disclose that information publicly by knowingly signing the agreements with NAF. *See Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1994). Nor did the district court abuse its discretion in concluding that a balancing of the competing public interests favored preliminary enforcement of the confidentiality

4

agreements, because one may not obtain information through fraud, promise to keep that information confidential, and then breach that promise in the name of the public interest. *See Dietemann v. Times, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office. . . . simply because the person subjected to the intrusion is reasonably suspected of committing a crime.").

10. The defendants claim that they were released from their contractual obligations because they obtained evidence of criminal wrongdoing. But the district court, having reviewed the recordings, concluded as a matter of fact that they had not. That determination is amply supported by the record. *See Pimentel*, 670 F.3d at 1105.

11. Our dissenting colleague believes that the district court erred in enjoining the defendants from voluntarily providing the purloined information to law enforcement. But even assuming the dubious proposition that the defendants were entitled to root out what they considered to be illegal activities through fraud and breach of contract, the district court's finding that they uncovered no violations of the law is a sufficient answer to any right claimed by the defendants.[2]

---

[2] The dissent cites no authority for the proposition that "our system of law and order depends on citizens being allowed to bring whatever information they have, however acquired, to the attention of law enforcement." Dissent at 3. Even if true, however, the proposition would confer no right on citizens to obtain that information through fraud or breach of contract.

12.    The preliminary injunction places no direct restriction on law enforcement authorities.   Rather, it enjoins the *defendants* from disclosing information to anyone except in response to a subpoena.  If law enforcement officials obtain a subpoena, the defendants have agreed in a stipulated Protective Order to notify NAF so that it can decide whether to oppose the subpoena.  The preliminary injunction and protective order explicitly provide that NAF may not "disobey a lawful . . . subpoena."  The preliminary injunction therefore in no way prevents law enforcement from conducting lawful investigations.

13.  The dissent, citing *S.E.C. v. O'Brien*, 467 U.S. 735, 750 (1984), argues that notifying the target of a third-party subpoena might allow that target to thwart an investigation by intimidating the third party and destroying documents.  But *O'Brien* involves investigations in which a target is unaware of an ongoing investigation and still possesses materials that would be the subject of a subpoena or potential investigation.  *Id*.  Here, by contrast, NAF already knows that some law enforcement authorities seek this information, the defendants—not NAF—possess the recordings, and the defendants, who are eager to comply with any subpoena for their own purposes, are hardly likely to destroy the subpoenaed recordings.  Moreover, the district court has preserved the recordings.

14.  Given the district court's finding, which is supported by substantial evidence, that the tapes contain no evidence of criminal activity, and its recognition

of several states' ongoing "formal efforts to secure the NAF recordings," the preliminary injunction carefully balances the interests of NAF and law enforcement. We therefore decline the request by the amici Attorneys General to modify the injunction.

**AFFIRMED.**



CALLAHAN, Circuit Judge, concurring in part and dissenting in part:

Constrained as I am by the applicable strict standards of review, *see Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (en banc), and *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012), I accept that Defendants have generally failed to carry their burden of showing that the District Court's grant of a preliminary injunction is an abuse of discretion.

I strongly disagree with my colleagues on the application of the preliminary injunction to law enforcement agencies. The injunction against Defendants sharing information with law enforcement agencies should be vacated because the public policy in favor of allowing citizens to report matters to law enforcement agencies outweighs NAF's rights to enforce a contract. This was recognized by the Supreme Court over thirty years ago in *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743 (1984) ("It is established that, when a person communicates information to a third party even on the understanding that the communication is confidential, he cannot object if the third party conveys that information or records thereof to law enforcement authorities.").[1] Accordingly, I find no justification for not

___

[1] *See also In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 610 (5th Cir. 2013); *Blinder, Robinson & Co., Inc. v. U.S. S.E.C.*, 748 F.2d 1415, 1419 (10th Cir. 1984).

1

allowing Defendants to share the tapes with any law enforcement agency that is interested.

Moreover, the District Court's determination that the tapes contain no evidence of crimes, even if true, is of little moment as the duties of Attorneys General and other officers to protect the interests of the general public extend well beyond actual evidence of a crime. In *United States v. Morton Salt Co.*, 338 U.S. 632, 643 (1950), the Supreme Court recognized that "[w]hen investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law." *See also Wilson Corp. v. State ex rel. Udall*, 916 P.2d 1344, 1348 (N.M. Ct. App. 1996) (noting that New Mexico's civil investigative demands "enable the Attorney General to obtain information without first accusing anyone of violating the Antitrust Act."); *CUNA Mut. Ins. Soc. v. Attorney General*, 404 N.E.2d 1219, 1222 (Mass. 1980) (noting that use of civil investigative demands is not limited only to person being investigated, but extends to seeking information from the insurer concerning possible violations of that statute by others); Ariz. Rev. Stat. § 44-1524(A) (allowing the Attorney General in investigating a violation to "[e]xamine any merchandise or sample thereof, or any record book, document, account or paper as he may deem necessary.").

Furthermore, disclosure to a law enforcement agency is not a disclosure to the public. As the Attorneys General amici note: "[l]aw enforcement regularly handles highly sensitive materials, such as the identity of informants, information regarding gangs and organized crime, and the location of domestic violence victims. If law enforcement cannot be trusted to handle information with the potential to risk bodily harm or even death if it falls into the wrong hands, then it simply cannot do its job." Accordingly, our system of law and order depends on citizens being allowed to bring whatever information they have, however acquired, to the attention of law enforcement. This case is no exception and the district court erred in preventing Defendants from showing the tapes to law enforcement agencies.

Similarly, the injunction violates this strong public policy by requiring that if a law enforcement agency contacts Defendants and seeks materials covered by the injunction, Defendants must notify NAF of the request and allow NAF time to respond. These conditions inherently interfere with legitimate investigations. *See Jerry T. O'Brien. Inc.*, 467 U.S. at 750. Moreover, the notice requirement does not purport to protect NAF from subsequent disclosures by a law enforcement agency after it had received the materials.

Whatever the balance between NAF's contractual rights and the

Defendants' First Amendment rights, law enforcement is entitled to receive information from citizens regardless of how the citizens procure that information. Accordingly, I would vacate the preliminary injunction insofar as it purports to limit Defendants from disclosing the materials to law enforcement agencies and requires that Defendants notify NAF of any request they receive for the materials from law enforcement agencies.